

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SHON LEE HALL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  2:17-cv-02000-RDP** |
| | } | |
| **CENTRAL TRANSPORTATION,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| | | |
| **SHON L. HALL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  2:18-cv-00853-RDP** |
| | } | |
| **CENTRAL TRANSPORT, INC.,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Shon Lee Hall filed this lawsuit against Defendant Central Transport, claiming that he was discriminated against because of his race (African-American) and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.[1] (Doc. # 25). These cases are before the court on Defendant's Motion to for Summary Judgment. (Doc. # 44). The Motion has been fully briefed (*see* Docs. # 45, 50, 53) and is ripe for review. After careful review, and

---

[1] On November 30, 2017, Plaintiff filed his initial complaint in this case, alleging race discrimination and retaliation. (Doc. # 1). On June 4, 2018, Plaintiff filed a separate lawsuit against Defendant alleging violations of the FLSA. (*See* 2:18-cv-00853; Doc. # 2). On August 24, 2018, the court consolidated the two cases. (Doc. # 24). In his Response to Defendant's Motion for Summary Judgment, however, Plaintiff confirmed that he is waiving all claims under the FLSA. (Doc. # 50 at 28). Therefore, the court addresses only Plaintiff's Title VII race discrimination and retaliation claims.

for the reasons explained below, the court concludes that Defendant's Motion (*see* Doc. # 44) is due to be granted.

## I.      Factual Background[2]

Plaintiff is an African-American male who was employed by Defendant between approximately July 22, 2011 and October 17, 2016. (Docs. # 46-3 at 7; 46-4 at 2).[3] Plaintiff applied to work for Defendant by filling out an application online, and thereafter he met with Chris Johnson, a Caucasian male, who was employed as Defendant's terminal manager. (Doc. # 46-2 at 15-17). Plaintiff first began working as a "night line haul" truck driver, which required Plaintiff to drive an 18-wheeler tractor trailer to Atlanta, Georgia, delivering and picking up (*i.e.*, loading and unloading) freight. (Doc. # 46-2 at 11). Plaintiff received his initial training[4] from Derek Renkema[5] (a Caucasian male) who, at that time, was employed as a night line haul driver. (*Id.* at 16-17). After about a week of working the night line haul, a "day job route" opened that allowed Plaintiff to drive to and from Gadsden, Alabama every day. (*Id.* at 18). When Plaintiff transferred into that position, he changed position titles from night line haul driver to "city driver." (*Id.*). About three months after that, a Tuscaloosa route opened up and Plaintiff transferred to work that route (*Id.* at 18-19). Plaintiff was also trained for that position, and he

---

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] When the court cites to a specific page number, with respect to depositions, the page number corresponds to the deposition page number. With respect to any other document, the court cites to the court-filed page number.

[4] Before Plaintiff began working for Defendant, he had prior experience as a truck driver. So, while some of the training was new for him, he had background knowledge about the job. (Doc. # 46-2 at 13-16).

[5] In 2011, when Plaintiff first began his employment, Renkema trained him as a driver because Renkema held the same position at that time. In September 2015, Renkema was promoted to terminal manager. (Doc. # 46-12 at 25).

2

stayed on the Tuscaloosa route for approximately five years, until his termination. (*Id.* at 19-20).

As a driver, Plaintiff was required to carry a handheld device which was used to record and track "deliveries and pickups" electronically. (Docs. # 46-1 at 23-25; 46-4 at 3). For example, a driver would use the device to log information about deliveries and communicate with Defendant and its customers. (Docs. # 46-1 at 25; 46-3 at 13). While at a location:

> [A] driver must scan the barcode stickers 'pro number' affixed to each individual pallet of freight being delivered, followed by the customer signing the handheld device as acknowledgment of the receipt. The customer signature on the handheld device is then transmitted to the applicable bill-of-lading,[6] generating a delivery receipt bearing the customer's signature. If the handheld device is malfunctioning such that the customer's signature cannot be obtained on the handheld device, the driver is to have the customer sign the bill-of-lading confirming receipt of the freight. The driver then provides the signed bills-of-lading to [Defendant] when he returns to the terminal at the end of his route.

(Doc. # 46-4 at 2-3). Dean Kuska, an employee of Liberty Bell Agency (who contracts with Defendant),[7] testified that the handheld devices could, and did, malfunction frequently by losing service. (Doc. # 46-1 at 24). If a handheld device malfunctioned, the bills-of-lading were not to be scanned into the handheld once it came back online; rather, a driver was to notify a supervisor of the issue, and the supervisor would direct the employee how to proceed. (*Id.* at 26; Doc. # 46-3 at 14). Nevertheless, Plaintiff testified that it was common practice among all the drivers to later input every delivery/pickup in the handheld if it reconnected before the end of the day. (Doc. # 42-2 at 80).

Additionally, Defendant used "GPS data to track its city drivers' routes throughout the day." (Doc. # 46-4 at 3). "The GPS allow[ed] [Defendant] to closely monitor the driver's every

---

[6] A bill-of-lading is used to confirm receipt of freight by a customer. It "is the contract between the shipper of goods and the carrier detailing the type, quantity, and destination of the fright being transported." (Doc. # 46-4 at 4).

[7] Liberty Bell Agency "is a quality management service provider," and Kuska had "general oversight for work comp, liability, and employment practice liability." (Doc. # 46-1 at 8).

move while under dispatch by transmitting and electronically recording the driver's coordinates at a rate of every three (3) minutes or more frequently." (*Id.*). If a handheld malfunctioned, the GPS data was not affected because the GPS data was transmitted through a separate operating system. (*Id.*).

Plaintiff testified that, starting in late 2015, he believed that Renkema was discriminating against him based on race. (*Id.* at 28-44). Renkema is the employee who initially trained Plaintiff, and became the new terminal manager and Plaintiff's direct supervisor. (*Id.*). Plaintiff testified that he believed Renkema treated Caucasian employees more favorably than African-American employees by (1) giving African-American drivers heavier loads to deliver and/or pick up,[8] (2) burdening African-American drivers with unfair delivery and pick-up locations,[9] and (3) preventing African-American drivers from leaving early on Fridays (while giving Caucasian drivers these opportunities). (*See id.* at 33, 36-37). Additionally, Plaintiff testified that he overheard Renkema saying that Eric Cooper, an African-American truck driver, looked like a monkey, and called him "coon."[10] (Docs. # 46-2 at 115; 46-12 at 128-29). Plaintiff also testified that Renkema was "vindictive;" regardless of one's race, "[i]f you question[ed] him about anything he was going to make it hard on you." (Doc. # 46-2 at 45-46).

Plaintiff testified that, during a normal delivery or pick up, if he finished earlier than anticipated, he was required to contact dispatch, and they would direct him how to proceed from

---

[8] Plaintiff testified that Ron Hatworth, an African-American male, was targeted by Renkema. Plaintiff says that, on one shift, Renkema gave Hatworth four deliveries to Sally's (which Plaintiff characterized as a difficult and strenuous job). (Doc. # 46-2 at 31-32). Although Plaintiff tried to take two of the shifts (so that Hatworth did not have to do all four by himself), Renkema would not allow him to help Hatworth. (*Id.* at 32).

[9] Plaintiff testified that Renkema frequently sent Larry Holmes and Michael Fagan, African American employees, into someone else's delivery/pick-up territory, "especially on Friday[s]," so that the Caucasian drivers could go home early rather than completed their shift. (Doc. # 46-2 at 34-35).

[10] Renkema testified that he believed Cooper's nickname to be "coon," but that once he was informed what that term represented, he "apologized to the drivers that took offense to it," and he was reprimanded for using the term. (Doc. # 46-12 at 129).

there. (*Id.* at 60-61). Plaintiff was audited in April 2016 because there were a few instances where his GPS showed him sitting in one location for a long period of time. He explained that this was because he was waiting on dispatch to tell him what to do. (*Id.* at 60-61). Although Plaintiff did not receive any discipline as a result of the April 2016 audit, he testified that such audits are not routinely performed on city drivers. (*Id.* at 59).

On July 1, 2016, Plaintiff testified that his position was converted to "city driver lead,"[11] and that, while he was "supposed to get a raise," his salary never changed.[12] (*Id.* at 24, 131-33; Doc. # 50-1 at 1). During his transition, Plaintiff says he was still required to maintain his primary job, and that this so-called new "position" would merely add additional duties. (Doc. # 46-2 at 136). Plaintiff received about two weeks of training from Darryl (who held the position previously) to "set trailers with the computer in the office and . . . set the outbound trailers for the line haul and to set the trailers that go out to be loaded in the morning" (*i.e.*, organize the scheduling of deliveries and pick-ups). (*Id.* at 24, 133-34). However, Plaintiff was never fully trained. (*Id.*). Plaintiff testified that his additional responsibilities included closing out terminals, preparing bills-of-lading, assigning doors for trailers, and securing the building.[13] (Doc. # 50-1 at 1). These duties were not previously part of his former driver position. (Doc. # 46-2 at 24-25). Notwithstanding his assumption of these new responsibilities, Plaintiff testified that he did not receive the position he was trained for because Defendant hired an "outside" applicant—Brad

---

[11] Defendant disputes Plaintiff's claim that he received a promotion. Kuska testified that a transition from city driver to city driver lead would not be considered a promotion and the pay for the two positions was the same. (Doc. # 46-1 at 21). However, Plaintiff testified that this was a promotion because Darryl and Renkema had showed him on the computer that his position had changed. (Doc. # 46-2 at 26). Plaintiff also testified that other drivers did not have access to the computers, but he did, and contends this is another indication that his position had changed. (*Id.* at 26-27).

[12] Plaintiff testified that he filled out paperwork that indicated he would receive a pay increase in this position. (Doc. # 46-2 at 137).

[13] Plaintiff's description of his duties is consistent with the duties listed in the city driver lead job description. (*See* Doc. # 46-10).

Shupe, a Caucasian male. (*Id.* at 137).

According to Defendant, in September 2016, Plaintiff applied for the position of Outbound Supervisor, which Shupe was hired to fill. (Doc. # 46-12 at 84-85; Doc. # 46-4 at 2). Renkema told Plaintiff that they "decided to go another route," even though (according to Plaintiff) he had more experience than Shupe. (Doc. # 46-2 at 138).

On July 14, 2016, Plaintiff was "given a written warning for not communicating with [] Renkema . . . when using [his] handheld radio." (Doc. # 50-2 at 3). Plaintiff testified that he informed Renkema that the handheld had malfunctioned and that he "had been communicating with his supervisors via his personal cell phone." (*Id.*). Nonetheless, Plaintiff was given a written warning. (*Id.*). Nick Reeves and Chad Ireland, both Caucasian males who had previously done the same thing, were not disciplined. (*Id.*).

On October 3, 2016, Plaintiff received an Incident Action Report ("IAR") for failure to take a lunch break. (Doc. # 46-2 at 88).

In October 2016 -- about one week before he was terminated -- Plaintiff attempted to contact Rick Mayfield, Defendant's Regional Employee Relations Manager, about Renkema's discriminatory conduct towards his employees, particularly African-American drivers; however, Plaintiff was not able to reach Mayfield. (Doc. # 46-2 at 48-49).

On October 13, 2016, Renkema completed two IARs regarding Plaintiff's work performance. IARs are considered disciplinary in nature. (Doc. # 46-12 at 49).

The first IAR stated that Plaintiff "failed to show [a certain product/shipment] . . . actually delivered sometime prior to 11:55 am according to communication between the dispatcher and [Plaintiff]. It was actually scanned [in as] delivered at 17:41 pm." (Doc. # 46-2 at 90). Plaintiff testified that when he got to his first stop, his handheld malfunctioned. (*Id.* at 76).

He further testified that, even though the handheld malfunctioned, the customer signed the bill of lading. (Doc. # 46-2 at 96). After the malfunction, Plaintiff received a call from Shupe ("the second in charge to [Renkema]" and the Outbound Supervisor), who told Plaintiff to continue his route and his deliveries, and that if Plaintiff was required to make any other pick-ups, he would call and "give the address." (*Id.*). Plaintiff testified that he had only been scheduled to make deliveries (as opposed to pick-ups) that day. (*Id.* at 77). At 5:00 or 5:30 pm, Shupe told Plaintiff "to start heading back" and put his deliveries into the handheld when it came back on. (*Id.*). Plaintiff entered his deliveries for that day into the handheld before he returned to the terminal. (*Id.* at 80). Plaintiff says this was common practice when the handhelds malfunctioned. (*Id.*).

The second IAR noted that Plaintiff had "failed to show deliveries delivered at the actual time they were delivered in his hand held. [The particular delivery] was delivered prior to 11:55 but [Plaintiff] did not show it delivered until 17:36 pm." (*Id.* at 92).

With respect to both of these incidents, Defendant contends that Plaintiff forged a customer's signature. (Doc. # 46-2 at 75). Matt Shad, the Senior Manager for Labor Relations and Field Compliance, testified that he reviewed the GPS data gathered for Plaintiff on October 13, 2016. He testified that the GPS data showed "that [Plaintiff] was at the same location between 5:38 p.m. and 5:46 p.m. During those eight minutes, electronic delivery receipts were signed for five deliveries to customer locations[, and those locations were] a minimum of fifteen [and] a maximum of fifty miles apart from each other." (Doc. # 46-4 at 4).

On October 14, 2016, Plaintiff met with Renkema and was asked to sign both IARs. (*Id.* at 83). Patrick Mayfield was present via telephone. (*Id.* at 84). Plaintiff testified that Renkema would not give him his paycheck until he signed both reports. (Doc. # 46-2 at 83). Plaintiff objected, contending that this type of incident occurred frequently with many other drivers, but

7

that no other driver had been written up. (*Id.* at 84). Plaintiff asked why he was being issued two IARs. (*Id.*; Doc. # 46-6 at 2). Mayfield instructed Plaintiff to sign them, telling him "[i]t's nothing and go to work." (Doc. # 46-2 at 83). Mayfield informed Plaintiff that signing the IARs was not an admission of guilt and that he could write "whatever comments he wanted" on them. (Doc. # 46-7 at 1). Mayfield also reiterated to Plaintiff that refusing to sign an IAR is considered insubordination and constitutes grounds for termination. (*Id.*). Plaintiff signed the reports. (Doc. # 46-2 at 85). Defendant contends that, during this discussion, Plaintiff was loud and unprofessional in violation of the company's code of conduct. (Docs. # 46-6; 46-7). However, Plaintiff testified that he "never cursed, threatened[,] or bullied Renkema or [] Mayfield." (Doc. # 50-1 at 2).

On that same day, October 14, 2016, after the IARs were issued, Plaintiff testified that Renkema "chang[ed] everything around." (Doc. # 46-2 at 88-89). Plaintiff was taken off his normal Tuscaloosa route[14], "put on something else[,] and [Renkema] overload[ed] [his] truck" by assigning him deliveries that were usually on other drivers' routes. (Doc. # 46-2 at 88-89). Plaintiff informed Renkema that he "had an emergency" and left work. (*Id.* at 85). As he left, Plaintiff took copies of the bills-of-lading to "show [that Renkema was] being vindictive." (*Id.* at 101; Doc. # 46-6 at 2). Renkema asked Plaintiff to return the bills-of-lading, but Plaintiff ignored his request. (Doc. # 46-6 at 2). Defendant contends that this also violated company policy. (Doc. # 46-9 at 6-7).

On October 17, 2016, Defendant decided to terminate Plaintiff's employment. (Docs. # 46-1 at 37; 46-4 at 4; 46-9 at 2). Renkema testified that he called Plaintiff that day from the

---

[14] Plaintiff testified that this was not the first time that Renkema changed his route. During the week of October 3, 2016, after Plaintiff "started trying to contact . . . Mayfield about the bills of lading" (*see* Doc. # 46-2 at 86-87), Renkema sent him to VFW (a plumbing company) to make deliveries. (*Id.*). VFW was not on Plaintiff's usual route. (*Id.*).

company's office phone to inform him that he was terminated. (Doc. # 46-12 at 95). Plaintiff disputes this and claims that Renkema notified him of his termination on October 20, 2016. (Doc. # 50-1 at 1, ¶ 2).

Although Renkema notified Plaintiff of his termination, Shad was the primary decisionmaker. (Doc. # 46-4 at 4). Shad testified that Plaintiff was fired for four reasons: (1) unprofessional conduct; (2) insubordination; (3) forging customer signatures on bills-of-lading; and (4) removing bills-of-lading from company premises without authorization. (*Id.* at 2).

On October 17, 2016, Plaintiff filed his initial Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"). (Docs. # 1 at 8; 50-2 at 2). The EEOC's Charge Detail notes that the "Notice of Charge [was] prepared for serving via Digital Charge System" on October 19, 2016. (Doc. # 50-2 at 3). Plaintiff's EEOC Charge was not received by Defendant until October 25, 2019. (Doc. # 46-1 at 13-14; Doc. # 46-4 at 5).

October 21, 2016, Plaintiff filed an amended EEOC Charge which added a claim that his termination was based on his race. (Doc. # 1 at 9). The Amended Charge does not mention retaliation in the text, nor is the retaliation box checked. (Doc. # 1 at 9-10).

On October 24, 2016, Plaintiff was contacted by Charlie Burroughs, the Regional Security Manager for Defendant, regarding the bills-of-lading he had taken. (Doc. # 46-6 at 2). Plaintiff's wife returned the bills-of-lading on October 28, 2016. (Doc. # 46-6 at 5).

After Plaintiff's termination, Defendant did not fill his "city drive lead" position. (Doc. # 46-4 at 3). Rather, Shupe, the Outbound Supervisor hired in September 2016, assumed those duties. (*Id.*). The next two city drivers who were hired by Defendant were African American. (*Id.*).

On November 30, 2017, Plaintiff filed his initial Complaint in this action. (Doc. # 1). On

September 4, 2018, Plaintiff filed his Amended Complaint. (Doc. # 25).

## II.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson*

teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

III.    **Analysis**

Plaintiff's Amended Complaint contains two counts under Title VII: Count One alleges that Defendant subjected him to race discrimination, and Count Two alleges that Defendant

retaliated against him. (Doc. # 25 at 7, 9). Although the Amended Complaint makes reference to an alleged promotion, Plaintiff's response to Defendant's Motion for Summary Judgment makes clear that the challenged employment decision under both Counts is Plaintiff's termination. (*See generally* Doc. # 50).[15] After careful review, and for the reasons discussed in detail below, the court concludes that Defendant's Motion for Summary Judgment is due to be granted.

## A.      Plaintiff's Race Discrimination Claim

Absent direct evidence of racial discrimination (and, to be clear, there is no direct evidence in the Rule 56 record), Title VII claims are generally evaluated according to the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). The *prima facie* elements are flexible to accommodate the presentation of a variety of claims in different contexts. One of those methods is to require a Title VII plaintiff to establish a *prima facie* case of discrimination by showing, among other things, that he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class. *Borden v. Cheaha Reg'l Mental Health Ctr., Inc.*, 760 F. App'x 828, 831 (11th Cir.), *cert. denied*, 139 S. Ct. 2720, 204 L. Ed. 2d 1116 (2019), *reh'g denied*, 140 S. Ct. 30, 204 L. Ed. 2d 1185 (2019); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell*

---

[15] Plaintiff has therefore abandoned any promotion claim. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Since the claim has been abandoned, it is unnecessary to analyze it.

*Douglas*, 411 U.S. at 802; *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). This burden is one of production, not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004)..

### 1.    Plaintiff Has Established a *Prima Facie* Case of Discrimination

Plaintiff argues that he has established a *prima facie* case because, after his termination, he was replaced by a white employee, Shupe. (Doc. # 50 at 15-16). Defendant responds that Plaintiff cannot establish a *prima facie* case in this manner because he was not replaced by Shupe (who was the Outbound Supervisor). (Doc. # 46 at 11-12).

Establishing a *prima facie* case under this particular rendition of the *McDonnel Douglas* framework requires a plaintiff to identify the individual who replaced him and "show that the replacement actually performed [ ] plaintiff's duties." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989). Defendant did not hire another city lead driver after Plaintiff was terminated. (Doc. # 46-12 at 84-85). Rather, the Outbound Supervisor, Brad Shupe who is Caucasian, assumed some of his duties. (Doc. # 45 at 11-12).

However, after careful review, the court concludes that the question of whether Shupe officially replaced Plaintiff is immaterial. Without question, regardless of how Defendant characterizes the decision, the Rule 56 evidence raises an inference that Plaintiff's duties were assumed by a white employee. "If an employer could insulate itself from a Title VII suit merely by reassigning a discharged employee's duties to a white employee but never formally call it a

replacement, Congress's intent in enacting Title VII would be thwarted." *Tolbert v. Briggs & Stratton Corp.*, 510 F. Supp. 2d 549, 554 (M.D. Ala.), *aff'd*, 256 F. App'x 340 (11th Cir. 2007) (citing *Al–Hashimi v. Scott*, 756 F.Supp. 1567, 1579 (S.D. Ga. 1991) ("The defendant argues that since no new [employee] was hired, the plaintiff's position has not been 'filled' by anyone. The Court agrees with the plaintiff that this technicality should not be used to circumvent the plaintiff's rights under the statute.")). Because Plaintiff has presented evidence that his duties were assumed by a white employee, a reasonable jury could conclude that Plaintiff was replaced by someone outside the protected class. For summary judgment purposes, therefore, the fourth element of Plaintiff's *prima facie* case has been met.

### 2. Defendant's Legitimate, Non-Discriminatory Reasons for Plaintiff's Termination

Defendant has explained that it terminated Plaintiff's employment for (1) unprofessional conduct; (2) insubordination; (3) forging customer signatures on bills-of-lading; and (4) removing bills-of-lading from company premises without authorization. (Doc. # 46-4 at 2). These are without a doubt legitimate, nondiscriminatory reasons for terminating an employee. *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1325 n.16 (11th Cir. 1998) ("Title VII is not a shield against harsh treatment at the workplace. . . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). So, the burden shifts to Plaintiff to show these reasons are pretextual.

### 3. Plaintiff Has Not Demonstrated That Defendant's Reasons for His Termination Are a Pretext for Race Discrimination

The Eleventh Circuit recently reiterated how a plaintiff may meet his or her burden of establishing pretext:

To establish pretext, the plaintiff must show that the proffered reason was false

14

> and that the real reason was discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff may accomplish this by producing "sufficient evidence to allow a reasonable finder of fact to conclude that the [employer's] articulated reasons were not believable." *Brooks [v. Cty Comm'n of Jefferson Cty*, 446 F.3d 1160, 1163 (11th Cir. 2006)].. An employee must meet the employer's proffered reason "head on" and rebut it. *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each reason to survive a motion for summary judgment. *Id*. at 1037. If the plaintiff fails to show pretext, we will affirm the grant of summary judgment on that ground. *EEOC v. Total Sys. Servs*., 221 F.3d 1171, 1177 (11th Cir. 2000).

*Bruno v. Greene Cty. Sch*., 2020 WL 524723, at *2 (11th Cir. Feb. 3, 2020). In addressing pretext, "the plaintiff may not recast the reason, attempt to substitute his business judgment for that of the employer, or simply quarrel with the wisdom of that reason, assuming the reason is one that might motivate a reasonable employer." *Proe v. Facts Services, Inc*., 2012 WL 4711588, * 2 (11th Cir. Oct. 12, 2012) (quoting *Chapman*, 229 F.3d at 1030) (internal quotations omitted); *Rowell v. BellSouth Corp*., 433 F.3d 794, 798 (11th Cir. 2005) (noting that "[i]t is by now axiomatic that we cannot second-guess the business decisions of an employer")). To avoid summary judgment, Plaintiff must rebut each reason for his termination, and show that the real reason for his termination was his race. The court addresses each articulated reason in turn.

### a.  Unprofessional Conduct

The first basis asserted by Defendant for Plaintiff's termination is that he exhibited unprofessional conduct when, on October 14, 2016, Renkema asked him to sign the two IARs. Renkema and Mayfield both reported that Plaintiff was agitated, belligerent, and yelling. (Doc. # 46-6- at 3; Doc. # 46-7 at 2; 46-12 at 100). Plaintiff admits that he "may have raised his voice," but asserts that he "never cursed, threatened[,] or bullied Renkema or [] Mayfield." (Doc. # 50-1 at 2). Of course, Defendant need not show that Plaintiff cursed, threatened, and/or bullied another to have grounds to terminate for unprofessional conduct. Thus, the fact that Plaintiff did

not curse, threaten, or bully anyone does not establish that this reason for his termination was false.

Plaintiff also points out that Renkema has admitted that he had been yelled at and cursed at by others before, but in those instances, he only recommended IARs for those employees. (Doc. # 46-12 at 47, 100). However, while he could certainly write employees up, Renkema testified (and it is undisputed) that he did not have the authority to terminate anyone. (*Id.*). The decision maker with respect to Plaintiff's termination was Defendant's Senior Manager for Labor Relations and Field Compliance, Shad. (Doc. # 46-4 at 4). Plaintiff has not presented any evidence that Shad tolerated unprofessional conduct from other employees. Therefore, evidence that Renkema may have not terminated an employee for yelling and cursing does not raise a question about the veracity of this articulated reason for Plaintiff's termination.

Because Plaintiff has failed to establish that the first of the four reasons for his termination was false, he cannot establish that it was pretextual. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515)(emphasis in original)).

### b.    Insubordination

The second reason articulated for terminating Plaintiff is insubordination. The same incident where Plaintiff initially refused to sign the IARs and became angry with Renkema also serves as the basis for this charge of insubordination. For the same reasons discussed above, Plaintiff has failed to establish that the second of the four reasons for his termination was false. He cannot, therefore, establish that it was pretextual. *St. Mary's Honor Ctr.*, 509 U.S. at 515; *Brooks*, 446 F.3d at 1163.

### c.    Forging Customer Signatures on Bills-of-Lading

The third reason for Plaintiff's termination was forging customer signatures on bills-of-lading. Generally, when a pick-up or delivery is made, the customer signed the handheld device. The customer's signature was then transmitted to the applicable bill of lading, and a receipt was generated with the customer's signature. When the handheld failed to operate, the driver was supposed to have the customer physically sign the bill of lading. During the incident in question, while Plaintiff remained in one physical location during an eight minute period on October 13, 2016, Plaintiff entered electronic delivery signatures for locations that were between fifteen and fifty miles apart. Therefore, Defendant concluded that Plaintiff forged those customer signatures. (*See* Doc. # 45 at 15).

Plaintiff argues that, when he called Shupe to inform him that his handheld had malfunctioned, Shupe told him to keep making deliveries and record the signatures in the handheld when it came back online. (Doc. # 50 at 20). Once the handheld device came back online, Plaintiff "put marks in the signature to make his records complete, as instructed by [Shupe]." (*Id.* at 21). Plaintiff maintains, however, that the customer, not Plaintiff, signed the respective bill of lading." (*Id.*). Plaintiff also argues that Defendant's reason has shifted from forging signatures on the handheld device (the position it took in its EEOC position statement) to forging signatures on the bills-of-lading (the position it took in its summary judgment brief). He argues that a reasonable jury could conclude from Defendant's use of a shifting reason for termination demonstrates that the reason was a pretext for race discrimination.

To demonstrate pretext, the plaintiff must show both (1) that the proffered reason was false, and (2) that discrimination was the real reason for the employer's action. *Brooks*, 446 F.3d at 1163. The court cannot conclude that the slight shift in the forged signature explanation is, in

and of itself, sufficient to demonstrate that Defendant's reason is false. The Rule 56 record evidence shows that a signature on the handheld device is, generally, transmitted to a bill of lading. (Doc. # 46-4 at 2-3). To the extent Plaintiff, rather than the customer, signed the handheld device, that would obviously generate a bill-of-lading with Plaintiff's signature (not a customer's). Therefore, under these circumstances, the change from the "charge" of a forged signature on the handheld to one of a forged signature on the bill of lading does not itself indicate that the reason is false. *See Kretzschmar v. Birmingham Nursing & Rehab. Ctr. E., LLC*, 2017 WL 2212705 at \*17 (N.D. Ala. May 19, 2017) (no pretext where defendant offered evidence to the court regarding grounds for termination not included in its EEOC position statement); *Thomkins v. Cuts By Us., Inc*., 2019 WL 3387775 at \*9 (N.D. Ala. July 26, 2019) (no pretext shown by offering court examples of plaintiff's deficient leadership which were not presented to the EEOC).

Plaintiff also argues that Nicholas Reeves, a former white employee, signed his handheld device when making deliveries, but was not disciplined. (Doc. # 50 at 21).[16] However, Plaintiff has presented no evidence that Shad, the decision maker in this case, was aware that Reeves also signed the handheld device on behalf of a customer. Therefore, this evidence does not call into question the third reason for Plaintiff's termination. Because Plaintiff has not shown that this reason for his termination was false, he has failed to establish that the third of the four reasons for his termination was pretextual.

### d. Removing Bills-of-Lading From Company Premises Without Authorization

Defendant's fourth reason for Plaintiff's termination was that Plaintiff removed bills-of-lading without authorization. After the altercation between Plaintiff and Renkema on October 14,

---

[16] Plaintiff also makes reference to an affidavit by Reeves, but that affidavit has not been filed in the court record. (*See, generally*, Doc. # 50 and the exhibits thereto).

2016, Plaintiff took the company's bills-of-lading when he left work. (Doc. # 46-2 at 118-19). Renkema saw Plaintiff take the documents and asked him to return them. (*Id.*). Plaintiff refused and left with the documents. (*Id.* at 119). Thus, Plaintiff did not simply take some bills-of-lading home. Rather, it is undisputed that he took them in deliberate defiance of his supervisor's instruction. Plaintiff asserts that Defendant's fourth reason for his termination is pretextual because "the record is clear that Caucasian drivers Plaintiff [sic] removed bills of lading without company authorization on previous occasion(s), but Defendant did not discipline them in any way." (Doc. # 50 at 22). Plaintiff cites to Renkema's deposition at page 48 in support of this argument. The court has reviewed page 48 of Renkema's deposition (and the surrounding pages). Renkema merely testified that he did not recall disciplining anyone for removing bills-of-lading without authorization. (Doc. # 46-12 at 48). Nothing about Renkema's testimony can be read to say that any other employees had removed bills-of-lading without authorization, that he was aware of that happening, or (and this is the critical inquiry) that the actual decisionmaker Shad was aware of that. Plaintiff has provided no other record citation to support this argument. Therefore, the records is *not* clear that other, white employees had committed the same work rule violation as Plaintiff and were not disciplined for it. Plaintiff has failed to establish that the fourth of the four reasons for his termination was false. Therefore, he has not established that it was pretextual.

### e.      Plaintiff Has Failed to Show Race was the Real Reason for his Termination

Establishing pretext is not just about calling an employer's reasons for a termination into question. To demonstrate pretext, the plaintiff must also show that discrimination was the real reason for the employer's action. *Brooks*, 446 F.3d at 1163.

As evidence of racial bias, Plaintiff testified that he overheard Renkema saying that Eric

Cooper, an African-American truck driver, looked like a monkey and he called him "coon.". (*Id.* at 115). He testified that on one occasion, Renkema gave him some of a white employee's delivery locations in violation of company policy. (*See* Doc. # 46-2 at 88-89). And, Plaintiff testified that Kris Benson, a Caucasian driver, used profanity frequently with Renkema but was never terminated. (Doc. # 46-2 at 206-07). However, Plaintiff also concedes that Renkema treated both African-American and Caucasian drivers the same if they questioned him about any of his decisions. (Doc. # 46-2 at 45-46).

What little evidence of racial bias Plaintiff has presented all relates to Renkema. However, it is undisputed that Renkema was not the decisionmaker with regard to Plaintiff's termination – Shad was. Moreover, Plaintiff has not alleged that Renkema, Shad, or anyone else made any comments indicating racial bias that were in any way connected to the decision to terminate Plaintiff. Stray comments by a supervisor which are not related to the termination decision are insufficient to show pretext absent some other evidence. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) (pretext not established by supervisor's statement, "[w]e'll burn his black ass"); *see also Addison v. Ingles Mkts., Inc.*, 2012 WL 3600844 at *14 (M.D. Ga. Aug. 21, 2012) (no pretext where manager made derogatory comments about President Obama and asked why one department employed so many African Americans). Finally, Plaintiff has not presented any Rule 56 evidence that (1) Shad has ever made any discriminatory remarks, or (2) that Renkema induced Shad to terminate Plaintiff for discriminatory reasons. *Cf. Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (recognizing the "cat's paw" theory for establishing discrimination). Accordingly, this purported evidence of racial bias presented by Plaintiff is insufficient to establish pretext.

Because Plaintiff has failed to establish that each of the four reasons for his termination

were false, he has not satisfied his burden of showing that all of those reasons were pretextual. *See Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (noting that "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.") (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)). In fact, Plaintiff has not shown that any of the reasons are pretextual, much less that all of them are. Therefore, Defendant is entitled to summary judgment on Plaintiff's discrimination claim.

### A.      Plaintiff's Retaliation Claim

Title VII bars an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). On October 17, 2019, after the October 14 incident with Renkema and Mayfield regarding the two IARs, Plaintiff filed a charge of discrimination with the EEOC. (Doc. # 50-1 at 3, ¶ 14). Then, on October 20, 2019, Plaintiff received a telephone call from Renkema informing him that he was terminated and instructing him to pick up his final paycheck on October 21, 2016. (*Id.*). Renkema, however, testified that Plaintiff was terminated October 17, 2016, and that he called Plaintiff that day to notify him. (Docs. # 46-1 at 37; 46-4 at 4; 46-9 at 2). On October 21, 2016, Plaintiff filed an amended charge of discrimination which alleged that he believed his termination was discriminatory. (Doc. # 1 at 9-10). The amended charge does not mention retaliation, nor is the "retaliation" box checked. (*Id.*).

Defendant has presented undisputed evidence that it did not receive notice of Plaintiff's EEOC Charge until October 25, 2016. (Doc. # 46-1 at 13-14).

### 1.      Plaintiff Has Sufficiently Exhausted His Administrative Prerequisites

"Prior to filing a Title VII action ... a plaintiff first must file a charge of discrimination

with the EEOC." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970).[17]
Defendant argues that Plaintiff failed to exhaust his administrative remedies for his retaliation
claims because he did not specify that he had suffered retaliation in either charge. (Doc. # 45 at
19-20).  However, in binding precedent the former Fifth Circuit held "that it is unnecessary for a
plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an
earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out
of an administrative charge that is properly before the court." *Gupta v. E. Tex. State Univ.*, 654
F.2d 411, 413-14 (5th Cir. Unit A Aug. 1981); *see also Baker v. Buckeye Cellulose Corp.*, 856
F.2d 167, 168-69 (11th Cir. 1988) (district court possessed jurisdiction over the retaliation claim
because the retaliation claim "could reasonably be expected to grow out of the original charge of
discrimination.").

The undersigned previously has applied *Gupta* and *Baker* to conclude that a plaintiff need
not administratively exhaust his or her EEOC remedies before filing a retaliation claim growing
out of an earlier-filed EEOC charge. *See Davis-Young v. Protective Life Corp.*, 2014 WL
4264845, at *7 (N.D. Ala. Aug. 21, 2014) (distinguishing the retaliation claim in *Gupta* from the
retaliation claim presented); *Skotnicki v. Bd. of Trs. of Univ. of Ala.*, 2014 WL 3891973, at *13
(N.D. Ala. Aug. 8, 2014) ("When a retaliation claim is based on a retaliatory action taken against
the employee *after* the initial EEOC charge is filed, the Eleventh Circuit has concluded that the
retaliation claim necessarily grows out of a properly filed employment discrimination charge,
and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation."),
*aff'd*, 631 F. App'x 896 (11th Cir. 2015). Here, Plaintiff did file an amended charge. Although
that charge does not mention retaliation, it references the original charge and alleges that, after

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit
adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30,
1981.

the date of the original charge, Plaintiff's employment was terminated. Because Plaintiff did not have the assistance counsel at that time, the court will not hold technicalities against him.

Viewing the facts in the light most favorable to Plaintiff, an investigation Plaintiff's retaliation claims could grow out of either the October 17, 2016 charge, or the amended charge. Because Plaintiff's race discrimination claim based on those charges is properly before the court, Plaintiff's retaliation claim is also properly before the court. *Baker*, 856 F.2d at 168-69; *Gupta*, 654 F.2d at 413-14.

### 2.      Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that "(1) he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events." *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "If a plaintiff establishes a *prima facie* case of retaliation and the employer proffers a legitimate, non-[retaliatory] reason for the adverse employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Watson v. Kelley Fleet Servs., LLC*, 430 F. App'x 790, 791 (11th Cir. 2011) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)).

Because it is undisputed that Plaintiff engaged in statutorily protected conduct when he filed his EEOC charge and was terminated, Defendant focuses its argument on the third element: causation. (Doc. # 45 at 20-21). The court concludes that Plaintiff has failed to establish the requisite causal nexus between his charge and his termination because the undisputed Rule 56 evidence shows that Defendant was unaware of Plaintiff's EEOC Charge when it made the

decision to terminate Plaintiff.

Defendant's witnesses gave testimony that it did not receive notice of Plaintiff's EEOC Charge until October 25, 2016. (Docs. # 46-1 at 14; 46-4 at 5). Plaintiff argues that, because Plaintiff's EEOC Charge was "issued" on October 19, 2016 via electronic means, it necessarily would have been received instantly on October 19. (Doc. # 50 at 24). Plaintiff bases this argument on a note that the charge was "prepared for serving via Digital Charge System" on October 19, 2016. (Doc. # 50-2 at 3). However, evidence that the charge was "prepared for serving" is not the same as evidence that it was actually "served." Nor does it establish that it was received by Defendant on that date. Simply put, the testimony of Kuska and Shad that the Charge was not received until October 25, 2016 is undisputed. (Docs. # 46-1 at 14; 46-4 at 5).

Because Plaintiff has failed to present evidence that Defendant was aware of his EEOC Charge at the time it terminated his employment, he cannot establish causation—the third element of his *prima facie* case of retaliation. *See generally Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988) (affirming grant of summary judgment to the defendant on retaliatory discharge claim where there was uncontradicted evidence that the decisionmakers were unaware of the plaintiff's threat to file an EEOC charge); *McCollum v. Bolger*, 794 F.2d 602, 610-11 (11th Cir. 1986) (affirming judgment for defendant and holding that the plaintiff failed to prove a *prima facie* case of retaliation where evidence at trial showed that the decision maker did not know that the plaintiff was engaging in protected conduct).

### 3.      Plaintiff Has Failed to Establish Pretext

Even if Plaintiff had presented a *prima facie* case of retaliation (which, to be clear, he has not), Defendant has sufficiently "proffered . . . legitimate, [non-retaliatory] reason[s] for the adverse employment action." *Watson*, 430 F. App'x at 791. Therefore, the burden shifts back to

Plaintiff to "meet the employer's reason[s] 'head on and rebut [them].'" *Id.* (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). And again, under Eleventh Circuit precedent, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *Brooks*, 446 F.3d at 1163 (citation omitted) (internal quotation marks omitted).

Defendant articulated four reasons for terminating Plaintiff's employment: (1) unprofessional conduct; (2) insubordination; (3) forging customer signatures on bills-of-lading; and (4) removing bills-of-lading from company premises without authorization. For the same reasons discussed in the analysis of Plaintiff's discrimination claim, the court concludes that Plaintiff has failed to show that each one of Defendant's reasons are a pretext for retaliation. Indeed, he has not shown that any of them are so. (*See* pp. 14-21 *supra*). Therefore, Defendant is also entitled to summary judgment on Plaintiff's retaliation claim.

## IV.  Conclusion

For all of the foregoing reasons, Defendant's Motion for Summary Judgment is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this April 15, 2020.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE